**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 28, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEN HUBBARD; CONNIE HUBBARD,
as Administrators of the Estate of Andrew
DeWayne Prior, deceased, and as guardians
and next friends of C.E.H., a minor child,
and E.J.H., a minor child,

     Plaintiffs - Appellants,

v.

THE STATE OF OKLAHOMA ex rel.
THE OKLAHOMA DEPARTMENT OF
HUMAN SERVICES; FRANCIA ALLEN;
TONYA BUSBY; KRYSTAL
CARAWAY; LATOYA CLARK; LINDA
DEVIN; BROOKE DEMERS; RYAN
DUGGER; CODY EASON; JESSICA
ELMORE; KELLIE HEATH; JERMAINE
JOHNSON; KATHLEEN KEANY;
HEATHER KELLEY; MICHAEL
KINDRICK; AUBREY KING; AMY
MCCARTNEY; AUBREY MEEKER; TIA
MORGAN; JOYCE PORTER; JANET
RHYNE; COLETTE THOMPSON; ROB
WILLIAMS,

     Defendants - Appellees.

No. 17-6162
(D.C. No. 5:16-CV-01443-HE)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

_____

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **LUCERO**, **McKAY**, and **MATHESON**, Circuit Judges.

_____

Ken Hubbard and Connie Hubbard are the great uncle and great aunt of minor children E.J.H. and C.E.H., as well as the administrators of the estate of minor child A.P. (together, "the Hubbards").  The Hubbards sued numerous employees of the Oklahoma Department of Human Services ("DHS") under 42 U.S.C. § 1983 for violations of the children's substantive due process rights under the Fourteenth Amendment.  In addition, they brought tort claims for negligence and wrongful death under Oklahoma state law against DHS and individual DHS employees.  They sought injunctive relief and a declaratory judgment based on the federal claims.  The Hubbards now appeal the district court's order dismissing their amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's dismissal of the federal claims and remand on the state claims to consider whether supplemental jurisdiction should be declined to enable the Hubbards to bring their state claims in state court.

# I. BACKGROUND

## A. *Factual Background*

In considering a motion to dismiss, we accept the allegations in the complaint[1] as true and view the allegations and all reasonable inferences in favor of the plaintiffs—here, the Hubbards. *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016).

### 1. Biological Parent Custody

Between August 2011 and February 2013, DHS received nine referrals expressing concerns that E.J.H., C.E.H., and A.P. were being abused and neglected by their biological parents. Aplt. App., Vol. II at 284. These referrals included the following allegations: (1) the presence of a convicted sex offender in the home, substance abuse, and apparent mental health issues with the parents; (2) lack of supervision and a convicted sex offender still in the home; (3) open drug use in the home; (4) unattended children while a fire burned in the backyard and firefighters later noting a "horribly dirty" and unsafe home; (5) failure to provide A.P. with food or clothing and failure to visit A.P. in the hospital when he was suffering respiratory problems (he had been taken there by a babysitter); and (6) a "filthy beyond filthy" home, with the children unattended and the parents using methamphetamine. *Id.* at 279-82.

Following referral (4) about the fire, the biological father admitted to DHS to having schizophrenia and using marijuana. *Id.* at 281. The maternal grandmother, who

---

[1] The amended complaint, the operative complaint here, is located at pages 277-304 of Volume II of the Appellants' Appendix. We cite to the relevant Appendix page number when referencing the amended complaint.

resided in the home, admitted to DHS a history of smoking crack cocaine and stated that her own children had previously been taken away from her due to drug abuse and failure to protect them from sexual abuse. *Id.* Following referral (6), E.J.H. told DHS that he received a "whoopin' on his butt with a paddle and belt." *Id.* at 282. He also complained about bugs in the house and said his parents made no attempt to get rid of them. *Id.* In follow-up interviews, the biological father again admitted he had schizo-affective disorder and bipolar disorder but was not on medication for them. *Id.* at 282-83. He also admitted he had hit his wife. *Id.* at 282. The biological mother admitted to using marijuana. *Id.* at 283.

In February 2013, the Tulsa Police Department was called about allegations of neglect, dangerous conditions, and child abuse (A.P. had recently been hospitalized for grease burns). *Id.* When officers arrived, they noted that the house was stacked with garbage, had no running water, and that the bathroom was full of feces. *Id.* The police determined that the biological parents' home was unsuitable for the children and directed that they be removed. They made this determination just weeks after a DHS employee had visited the home and determined it was suitable. *Id.* at 284.

A state court adjudicated the children to be deprived. *Id.* DHS formulated Individualized Service Plans for the biological parents, but before those plans were implemented, and before the unsuitable home conditions were corrected, DHS employees recommended a trial reunification. The state court adopted the trial reunification plan in May 2013, and the children were returned to their biological parents' home. *Id.*

4

The biological parents, however, continued to keep an unsafe home, and the trial reunification was unsuccessful. The parents were arrested for child abuse in August 2013 after a referral to DHS for serious neglect was relayed to police. *Id.* at 284-85. Reporting on their visit to the home, the police stated that it smelled of "spoiled food, animal urine and feces and garbage." *Id.* at 285. Police officers noted "the two children's beds were both filthy and stained with what appeared to be urine, there was a large cockroach nest in the children's bedroom, with thousands of cockroaches crawling on the bedding, clothing, walls, and windows." *Id.*

## 2. Foster Placement with the Krajians

In August 2013, DHS placed the children in the foster care of Mallory and Peter Krajian ("the foster parents").[2] DHS records show that the Krajians, when they enrolled in the foster parent program, indicated they were unwilling to accept foster children with a history of "inappropriate sexual activity, sexually abusing others," or being "sexually active." *Id.* at 286.

During the time the children were in foster care, DHS continued to receive referrals concerning their welfare. In September 2013, a referral from the Krajians alleged that E.J.H. was sexually assaulting his sister C.E.H. *Id.* at 287. In associated interviews, C.E.H. said her brother "made her touch his pee pee," that more than once he "touched her pee pee with his mouth," and that he "made [her 'pee pee'] hurt." *Id.* Ms.

---

[2] At the time of their placement with the Krajians, E.J.H. was 5 years old, Aplt. App., Vol. III at 407; C.E.H. was 3, *id.*; and A.P. was 2, *id.,* Vol. I at 63.

Krajian told DHS employees that C.E.H. also said her brother "stuck his private in [A.P.]'s butt." *Id.*

DHS arranged therapy for E.J.H. and C.E.H., but the Krajians often failed to take the children to their scheduled session, missing at least six appointments. *Id.* at 288. One DHS supervisor, Joyce Porter, wrote of the failed appointments that her employee Tonya Busby's lack of effort on the case was "heinous & shocking" and that "we cannot allow one more week to go by without therapeutic intervention." *Id.*

In October 2013, a babysitter sent DHS another referral indicating that the children continued to act out sexually. *Id.* Investigating this referral, a DHS supervisor, Amy McCartney, detected "a strong odor of Marijuana" at the home and noticed that Ms. Krajian had bloodshot eyes. *Id.* E.J.H. said in an interview that he was being disciplined through spanking, that he was made to sleep on the floor when he was bad, that his foster parents smoked something in the home, and that he had been "bad with his sister by having sex with her." *Id.* at 289. C.E.H. told Ms. McCartney that her brother came into her room in the night and touched her sexually, and stated "I don't like it when he touches my privates." *Id.* The same evening, supervisor Krystal Caraway contacted supervisor Rob Williams expressing concerns about the Krajian household. *Id.* Mr. Williams told her that he was working toward removing E.J.H. from the home and placing him elsewhere. *Id.* The next month, at a staffing conference, DHS supervisor Ms. McCartney reported smelling marijuana on a visit and reported the children were being spanked and made to sleep on the floor. *Id.* at 290. DHS employees decided at this point (early November) to make future unannounced visits to the home. *Id.*

6

In February 2014, E.J.H. was removed from the home and placed in a different foster program called the Integris Medical STAR program. *Id.* The STAR program received a report that Ms. Krajian had scalded and injured A.P. by placing him in a hot bath, and that she blamed these injuries on E.J.H. *Id.* DHS did not open a referral incident based on this report. *Id.* at 291. E.J.H. remained in the STAR program until July and was then released back into the Krajian household. *Id.* During his time away, the Krajians did not participate in his STAR program treatment and also missed or cancelled roughly half of the therapy appointments scheduled for C.E.H. *Id.* at 290-91. E.J.H. told a STAR therapist in May 2014 that he had previously had sexual contact with his sister. *Id.* at 231.

On August 27, 2014, DHS received a referral reporting that A.P. was in the hospital. He had sustained a C-1 vertebral fracture and an occipital skull fracture, which resulted in his death on August 31, 2014. *Id.* at 291-92. E.J.H. maintained that the injury was from A.P.'s falling off a couch while jumping and hitting his head on a coffee table. *Id.* at 292. C.E.H. disclosed in an associated interview that she had been spanked with a wooden hanger until she bled and that Mr. Krajian had pulled out tufts of her hair, leaving bald patches (which were noted by the doctors as well). *Id.* Ms. Krajian was charged in state court with felony child abuse murder. *Id.* at 278. Following A.P.'s death, E.J.H. and C.E.H. were removed from the foster home and placed with the Hubbards.

B. *Procedural History*

The Hubbards filed a complaint in Oklahoma state court against DHS and several

7

employees, along with Dayspring Community Services ("Dayspring") and Laura Fox, an employee there, over the death of A.P. while in foster care. Aplt. App., Vol. I at 15. The Defendants removed the case to federal district court and filed motions to dismiss. *See id.* at 33, 49, 61, 122. The Hubbards were granted leave to amend their complaint, and they dropped their claims against some defendants, including against Dayspring and Ms. Fox.

The amended complaint alleged a federal civil rights violation against individual DHS employees under 42 U.S.C. § 1983, asserting that their conduct deprived the children of their substantive due process rights.[3] Aplt. App., Vol. II at 292. It also alleged state law negligence and wrongful death violations against DHS and individual DHS employees. *Id.* at 297, 301. Additionally, the amended complaint sought "a declaratory judgment that declares that DHS has failed to allocate necessary and adequate funding such that DHS, through its employees, was not able to meet regulatory and legislative requirements regarding appropriate supervision, protection and oversight of minors . . . ." *Id.* at 295-96.

The Defendants again moved to dismiss, and the district court granted their motion. Aplt. App., Vol. III at 418.

---

[3] The Hubbards did not allege a federal civil rights claim against DHS itself. *See* Aplt. App., Vol. II at 292 ("The conduct of the individual Defendants . . . deprived [the children] of the following [constitutional] rights."); *see also* Aplt. Br. at 31-39, 40-43 (discussing federal civil rights claim in "Individual Defendants" section of briefing and not in "Department of Human Services" section).

8

1. **Summary of the Hubbards' Claims**

The Hubbards' allegations against individual DHS employees are summarized alphabetically below. For the purposes of a motion to dismiss, the allegations are taken as true:

a. *Pre-foster care*

- Francia Allen: Ms. Allen appears to have been the children's case manager up until June 2013. Aplt. App., Vol. II at 285. Ms. Allen recommended a trial reunification of the children with their biological parents despite DHS not yet implementing its plan for the home, thereby allegedly placing the children "in imminent risk of further abuse" and increasing their "vulnerability to such abuse." *Id*. at 284.

- Tonya Busby: Ms. Busby "took over" the children's "case" in mid-June 2013. *Id.* at 285. She had visited the home only "a couple of times" between June and early August. *Id.* A referral in August during the trial reunification with the biological parents eventually led to their arrest for child abuse. *See id.* at 284-86. The police responding found a large cockroach nest in the children's bedroom and an extremely filthy home. *Id.* at 285. Ms. Busby had noted flies in the home, but was not sure where they were coming from (even though a police officer reported that there were feces and urine all over the bathroom). *Id.* at 286. She did not normally check the home to see if there was food available. *Id.* Upon the arrest of the biological parents, Ms. Busby "chuckl[ed]" and said that her scheduled unannounced visit to the home was no longer necessary. *Id.* at 286.

- Krystal Caraway: Ms. Caraway was a supervisor during trial reunification, which resulted in the referral and the arrest of the biological parents for child abuse. *Id.* at 284-86.

- Latoya Clark: Ms. Clark was a supervisor who received the August 2011 referral (1)[4] regarding a convicted sex offender living in the home, as well as substance abuse and mental health issues alleged regarding the parents. *Id.* at 279-80. She allegedly "took no action to protect or safeguard the [c]hildren from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 280.

- Linda Devin: Ms. Devin was a supervisor who received the December 2011 referral (4) regarding a fire burning in the backyard. *Id.* at 280-81. She allegedly "determined that the children were in a safe environment without any safety threats," *id.* at 281, and "took no action to protect or safeguard the [c]hildren from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.*

- Cody Eason: Mr. Eason was present for the referral during the trial reunification that led to the parents' arrest for child abuse based on a squalid home. *Id.* at 284-85.

---

[4] The numbers listed in these excerpts about individual defendants correspond to the numbered referrals in the second paragraph of the "Factual Background" section above.

- Jessica Elmore:  Ms. Elmore recommended a trial reunification of the children with their biological parents despite DHS's not yet having implemented its plan for the home, thereby allegedly placing the children "in imminent risk of further abuse" and increasing their "vulnerability to such abuse."  *Id.* at 284.

- Kathleen Keaney:  Ms. Keaney received a September 2011 referral (3) alleging open drug use in the home.  DHS screened out this referral.  *Id.* at 280.

- Heather Kelley:  Ms. Kelley was on duty during an August 2011 referral (1).  She requested an interview with A.P. the next day but was told he was unavailable because he was at an aunt's house.  *Id.* at 279.  She observed E.J.H. and C.E.H. bite and attack one another during a visit in August 2011.  *Id.* at 279-80.  She received a referral (4) concerning an unattended fire burning in the backyard in December 2011.  *Id.* at 280.  Following this referral she interviewed the biological family and learned about prior drug use by the parents and relatives and parental mental history.  *Id.* at 280-81.  Despite the fire incident and her learning of new information about the family, she "determined that the children were in a safe environment without any safety threats."  *Id.* at 281.  She received a February 2012 referral (5) regarding neglect of A.P. (no food, no clothing, and a necessary hospital visit for respiratory problems where neither of his parents visited him).  *Id.* at 281-82.  Ms. Kelley allegedly waited five days to open an investigation into the matter.  *Id.* at 282.  For each of these referrals, Appellants allege Ms. Kelley "took no action to protect or safeguard the [c]hildren from physical and/or sexual

11

abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 281, 282.

- Michael Kindrick: Mr. Kindrick was on duty during an August 2011 referral (1). *Id.* at 279. He allegedly "took no action to protect or safeguard the [c]hildren from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 281.

- Aubrey King-Meeker: Ms. King-Meeker received a February 2013 referral (6) alleging lack of supervision, threat of harm to the children (because of drug abuse in the home), and inadequate, dirty, and dangerous shelter. *Id.* at 282. It took her days to make contact with the family. *Id.* Upon investigating, she saw a scar on E.J.H.'s face. He told her that he had been "whoop[ed]" with a paddle and belt and about being bitten by bugs in the home. *Id.* The parents told her about abuse and violence between them, about mental health diagnoses, and self medication. *Id.* at 282-83. In the same month, police came to the house and started the process of removing the children after they found "deplorable living conditions" and after A.P. suffered grease burns and had to go to the hospital. *Id.* Only upon the police department's intervention did Ms. King-Meeker petition the court for the children's removal from the home. *Id.* at 283-84. Ms. King-Meeker allegedly "took no action to protect or safeguard the [c]hildren from physical and/or sexual

abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 283.[5]

- Tia Morgan: Ms. Morgan was a supervisor on the February 2012 referral (5). *Id.* at 281.

- Janet Rhyne: Ms. Rhyne was a supervisor on the February 2013 referral (6) with Ms. King-Meeker alleging lack of supervision and threat of harm to the children. *Id.* at 282. Through Ms. King-Meeker's interview, she learned of abuse and violence by the parents as well as their drug and mental health history. She allegedly "took no action to protect or safeguard the [c]hildren from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 283.

b. *During foster care*

The children were placed in foster care in August 2013 and lived with the Krajians.

- Tonya Busby: Ms. Busby received a September 2013 referral that E.J.H. was sexually assaulting his sister. *Id.* at 287. Through interviews with C.E.H. and Ms. Krajian, she received more detailed information, including that E.J.H. sexually assaulted A.P. *Id.* DHS set up therapy sessions for the children, but Ms. Busby

---

[5] Although the Hubbards stated in their amended complaint that Ms. King-Meeker and other pre-foster-care defendants took no action to protect the children from sexual abuse, the first reports to DHS of sexual activity listed in the amended complaint were in September 2013, following foster placement with and a referral from the Krajians. Aplt. App., Vol. II at 287.

allegedly did not follow up with the Krajians on the missed appointments. *Id.* at 288. Her supervisor, Ms. Porter, described Ms. Busby's lack of effort on the case as "heinous & shocking." *Id.* Ms. Busby also received an October referral that the children were acting out sexually and did not seem to take action. *Id.* She reported to her supervisor that she had only been to the Krajian home once, and on a scheduled and announced visit (rather than unannounced visits, as DHS had, at least by early November, determined to pursue). *Id.* at 290.

- Krystal Caraway: Ms. Caraway, a supervisor, received the September and October 2013 referrals, both of which detailed the children's sexual activity with one another. *Id.* at 287-88. She allegedly "took no action to protect or safeguard the [c]hildren . . . from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 287, 288. She was present for a meeting where it was decided to do unannounced home visits going forward.[6] *Id.* at 290. She had a discussion with Mr. Williams about next steps and was told that Mr. Williams was planning to remove E.J.H. from the home. *Id.* at 289.

- Brooke Demers: Ms. Demers received the September 2013 referral concerning sexual activity among the children and was also present at a November meeting where DHS decided to do unannounced home visits going forward. *Id.* at 287,

---

[6] The unannounced home visits allegedly did not happen. Aplt. App., Vol. II at 290 ("[N]o such unannounced visits are reflected in DHS records.").

14

290. She allegedly "took no action to protect or safeguard the [c]hildren . . . from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 287.

- Ryan Dugger and Jermaine Johnson[7]: Mr. Johnson received the August 2014 referral concerning A.P.'s skull fracture and a bad bruise on A.P.'s arm. *Id.* at 291. Mr. Dugger also learned through an interview with a doctor about the missing patches of hair on C.E.H.'s head. *Id.* at 292.

- Cody Eason: Mr. Eason received a September 2013 referral that E.J.H. was sexually assaulting his sister. *Id.* at 287. Through interviews with C.E.H. and Ms. Krajian, he received more detailed information (including that E.J.H. sexually assaulted A.P.). The complaint alleges that Mr. Eason took no action to protect the children. *Id.*

- Kellie Heath: Ms. Heath served as a DHS district director. She was present at a November meeting where Ms. McCartney discussed her October home visit and where it was decided to do unannounced home visits going forward. *Id.* at 290.

- Amy McCartney: Ms. McCartney conducted a home visit after the October 2013 referral. She smelled marijuana and saw Ms. Krajian's bloodshot eyes. *Id.* at 288. During an interview, E.J.H. told her he was spanked and told to sleep on the floor when bad, and also told her that "he was bad with his sister by having sex with

---

[7] It is unclear whether Mr. Dugger was dropped as a defendant between complaints. The district court treated him as a party and dismissed the claims against him. Aplt. App., Vol. III at 412 n.5.

her." *Id.* at 289.  Appellants allege she "took no action to protect or safeguard the [c]hildren . . . from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.*  Ms. McCartney told various other DHS employees about what she learned at the visit and said that she did not believe the Krajians were equipped to handle their foster assignment. *Id.* at 290.  DHS decided to start conducting unannounced visits sometime after this conversation, but it is not clear how Ms. McCartney was involved in that decision. *Id.*  Ms. McCartney also received the August 2014 referral concerning A.P.'s skull fracture and interviewed E.J.H., C.E.H., and Ms. Krajian's sister.  In those interviews she learned from C.E.H. that Mr. Krajian had been pulling out her hair, leaving missing patches, and that the Krajians had spanked her with a wooden hanger until she bled. *Id.* at 292.  Ms. Krajian's sister told Ms. McCartney that she had seen the children with bruises and bald spots on multiple occasions. *Id.*

- Joyce Porter:  Ms. Porter was Ms. Busby's supervisor.  Ms. Porter allegedly allowed the Krajians to miss their therapy appointments. *Id.* at 288.  Ms. Porter also received the August 2014 referral concerning A.P.'s skull fracture. *Id.* at 291.

- Colette Thompson:  Ms. Thompson received the October 2013 referral concerning the children acting out sexually while in a babysitter's care. *Id.* at 288.  She allegedly "took no action to protect or safeguard the [c]hildren . . . from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.*  She was present at a November

meeting where Ms. McCartney discussed her October home visit and where it was decided to do unannounced home visits going forward. *Id.* at 290. She was also one of Ms. Busby's supervisors. *Id.* at 288.

- Rob Williams: Mr. Williams received the September and October 2013 referrals discussing the sexual activity among the children. *Id.* at 287, 288. He allegedly "took no action to protect or safeguard the [c]hildren . . . from physical and/or sexual abuse, which inaction either enhanced the risk of further abuse, or increased the vulnerability to such abuse." *Id.* at 288. He was present at a November meeting where Ms. McCartney discussed her October home visit (which noted drug use, spanking, and sleeping on the floor) and where it was decided to do unannounced home visits going forward. *Id.* at 290. It took Mr. Williams approximately four months to arrange the removal of E.J.H. from the home (after stating his intention to do so to another DHS employee). *Id.* at 289, 290. He also served as one of Ms. Busby's supervisors. *See id.* at 287.

2. **District Court Decision**

The district court concluded the amended complaint failed to state a claim against any defendant and granted the Defendants' motions to dismiss. *Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Human Servs.*, No. CIV-16-1443-HE, slip op. at 18-19 (W.D. Okla. June 19, 2017) (unpublished).

17

a. *Federal substantive due process claims under the Fourteenth Amendment*

The district court dismissed the § 1983 Fourteenth Amendment substantive due process claims against the individual defendants for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Aplt. App., Vol. III at 414.

i. DHS employees involved in pre-foster-placement

The district court dismissed all § 1983 claims against DHS employees who were involved with the children only before the foster placement.  It said no viable theory of constitutional relief was available on these claims.  *See* Aplt. App., Vol. III at 405-06. Section 1983 does not provide for claims against government officials for failure to protect individuals from the private violence of another except when (1) there is a special relationship or (2) if the state created the danger.  The district court held that neither exception applied to the pre-foster-care defendants.  *Id.*  Accordingly, the court dismissed the federal claims against defendants Allen, Clark, Devin, Elmore, Keaney, Kelley, Kindrick, King-Meeker, Morgan, and Rhyne.  *Id*. at 406.

ii. DHS employees involved during foster placement

The district court dismissed all of the § 1983 claims against the during-foster-care-placement DHS defendants.  The court held that the "special-relationship" exception applied because DHS had placed the children in foster care.  *Id.* at 405.  But the Hubbards needed to show that each defendant's conduct "shocked the conscience."  *Id.*  The court held that, at most, the Hubbards' allegations may have shown negligence but not the "more exacting constitutional standard" of "shock the conscience."  *Id.* at 406.  As a

18

result, it held the § 1983 allegations failed to state a claim against any of the defendants. *Id.* at 414.

More specifically, the district court reviewed the claims against each during-foster-care defendant as follows:

- Ms. Busby: Ms. Busby's acts "would certainly constitute negligence and perhaps come closer to meeting the constitutional ['shock the conscience'] standard than do the allegations against other individual defendants. However, they do not ultimately allege conduct that meets the 'shock the conscience' standard." *Id.* at 408.

- Ms. Caraway: Ms. Caraway's failure to help follow up on the November plan to start making unannounced visits to the Krajian home may have been negligent, but not conscience-shocking, in part because she voiced her concerns to others. *See id.* at 410-11.

- Ms. Demers: Ms. Demers's failure to follow up on the November plan to start making unannounced visits to the Krajian home may have been negligent, but not conscience-shocking. Also, a September 2013 referral she received was followed-up with an investigation. *Id.* at 411.

- Defendants Dugger and Johnson: They became involved in the case in August 2014, after the abuse concluded. *Id.* at 412-13.

- Mr. Eason: "At most, the amended complaint arguably supports an inference that Mr. Eason (or someone) should have responded to the accounts of sexual acting

out by E.J.H. sooner than he did.  But that is, at most, simple negligence and does not constitute behavior that shocks the conscience." *Id.* at 407.

- Ms. Heath:  "At worst, Ms. Heath failed to follow up as to the allegations of abuse. As with the other defendants, such inaction may have constituted negligence, but does not shock the conscience." *Id.* at 412.

- Ms. McCartney:  "[T]he amended complaint's allegations indicate Ms. McCartney did respond to the issues in the Krajian home in various ways.  Those responses may have been inadequate and reflect negligence in responding to the information she had, but they do not suggest action, or lack of action, which shocks the conscience." *Id.* at 409-10.  She also made an effort to voice her concerns to others in DHS.  *Id.* at 409.

- Ms. Porter:  "Rather than alleging that Ms. Porter failed to act, the amended complaint shows that when Ms. Porter learned that the Krajians were not taking the children to therapy, she worked to correct that mistake." *Id.* at 408-09.  She also criticized her supervisee Ms. Busby's sluggishness in this regard, calling it "heinous & shocking." *Id.* at 408.  The court found no due process claim against Ms. Porter.  *Id.* at 408-09.

- Ms. Thompson: Ms. Thompson's failure to help follow up on the November plan to start making unannounced visits to the Krajian home may have been negligent, but not conscience-shocking. *Id.* at 410.

- Mr. Williams:  "[Mr. Williams's] delay in removing E.J.H. from the home after the second referral is troubling, and may indicate negligence on Mr. Williams'[s]

20

part in not moving more quickly. However, the allegations do not suggest present behavior which goes beyond negligence and 'shocks the conscience.'" *Id.* at 411-12.

Additionally, the district court held that no § 1983 claims based on supervisory liability were viable (as against defendants Caraway, Demers, Heath, Porter, Thompson, or Williams) because the amended complaint alleged no basis that a supervisor "create[d], promulgate[d], [or] implement[ed] . . . a policy" that violated the Hubbards' constitutional rights. *Id.* at 413 (citing the standard in *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).

b. *State claims—negligence and wrongful death*

The district court dismissed the state law claims against all Defendants—DHS and its employees—due to the Hubbards' failure to allege compliance with the Oklahoma Governmental Tort Claims Act ("OGTCA"), which establishes certain procedural prerequisites to bringing suit. *See id.* at 415-16. It stated that all tort claims, even if they are derived from the Oklahoma Constitution, must comply with the OGTCA's procedural notice and claim requirements. *Id.* at 417-18.[8]

The Hubbards argued that their state claims did not need to adhere to the OGTCA's notice provisions because they alleged "willful and wanton" negligent conduct

---

[8] The district court thus did not address whether there is a private right of action (i.e., outside of the OGTCA framework) for a due process violation under the Oklahoma Constitution. The court said that even if there were such a claim, the OGTCA's procedural rules would apply, which the Hubbards have not followed here. *Id.* at 417-18.

21

by individual defendants, which would put them outside the scope of their employment. *See id.* at 415. The district court rejected this argument: "[The] amended complaint alleges nothing which would suggest the individual DHS defendants were pursuing some agenda of their own or otherwise acting outside the scope of their employment by DHS. Conclusory allegations of 'willful and wanton' behavior do not change that fact." *Id.*

    c. *Injunctive and declaratory relief*

The district court denied the Hubbards' request for injunctive or declaratory relief because there was no basis for either "[i]n the absence of an underlying violation." *Id.* at 418.

\*     \*     \*     \*

The Hubbards appealed the district court's dismissal of the amended complaint and the denial of injunctive and declaratory relief.

## II. DISCUSSION

We start with comments about the amended complaint. It names DHS and 20 individuals as defendants, though only the individuals were sued under § 1983. As we explain further below, the allegations against most of the individuals show no more than minimal involvement in this matter, and their inclusion in the amended complaint along with general references to DHS make it difficult to discern the conduct and knowledge of other individual defendants. The allegations often merely allege that someone has attended a meeting or received a referral and then has failed to act to protect the children—allegations that plainly fail to state a claim under the most generous reading of the amended complaint. The amended complaint attempts to list events that occurred in

22

chronological order, but it fails to clearly show how each individual defendant caused particular injury to a specific child. These shortcomings in the amended complaint make it a candidate for dismissal under Federal Rule of Civil Procedure 8(a)(2) for failure to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," but they also inform our analysis of the ground on which the district court dismissed the federal claims—failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Turning to our review of the district court's ruling, we note that the amended complaint alleged a systemic failure by DHS to serve and protect the children. The federal substantive due process claims, however, do not seek relief from DHS, but from each of 20 DHS employees who had varying degrees of involvement. Collectively and as alleged, these employees mishandled the case and failed to protect the children from harm. But we must decide whether the amended complaint adequately alleged a substantive due process claim against any one of them.

Individually, many of the defendants had only limited participation. They should not have been sued for a substantive due process violation. For those who participated more actively and with more responsibility, the amended complaint alleged conduct that was almost certainly negligent. But it did so in conclusory terms and did not allege the level of conscience-shocking conduct, and in some instances the causation, that our cases require for a substantive due process claim.

The individual defendants' alleged actions, in the aggregate, may come closer to the shocks the conscience standard than any individual defendant's actions, but the

Hubbards' § 1983 claims must stand or fall based on the conduct of each defendant individually. Under § 1983, there is no respondeat superior or vicarious liability. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

As alleged in the amended complaint, DHS's performance was deeply troubling, and the conduct of several individual defendants was blameworthy. But the law constrains us to affirm dismissal of the federal claims against the individuals because the amended complaint fell short. We are mindful that § 1983 is not supposed to replace state tort law, *see Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001), and remand for the district court to determine whether to decline jurisdiction over the state claims.

### A. *Fourteenth Amendment Claims*

#### 1. **Standard of Review**

"We review a Rule 12(b)(6) dismissal de novo." *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015) (quotations omitted). In doing so, "[w]e accept all the well-pleaded allegations of the complaint as true and . . . construe them in the light most favorable to [the Hubbards]." *Id.* (quotations omitted). To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements"

are not sufficient to state a claim for relief. *Id.*; *see also Hall v. Bellmon*, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

2. **Legal Background**

a. *42 U.S.C. § 1983*

Section 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

State actors, such as the individual defendants, "may only be held liable under § 1983 for their own acts." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A defendant-supervisor may be liable under § 1983, however, when that supervisor "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement . . . of which" violates a plaintiff's constitutional rights. *Dodds*, 614 F.3d at 1199. Supervisors cannot be liable under § 1983 where there is no underlying violation of a constitutional right by a supervisee. *See Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009).

b. *Section 1983 substantive due process claims and private actors*

The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195

25

(1989). Accordingly, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) ("[S]tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence.").

c. *Exceptions*

Courts have recognized two exceptions to *DeShaney*'s rule against substantive due process claims based on harms committed by private actors—the special relationship and danger creation exceptions.

i. <u>Special relationship</u>

State officials "can be held liable for harm done by third parties if the state has a special relationship with the harmed individual," that is, "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142-43 (10th Cir. 2006) (quotations omitted). "[F]oster care is recognized as one of the custodial relationships that creates a special relationship." *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012); *see also Yvonne L. By & Through Lewis v. N.M. Dept. of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992). "This 'special relationship triggers a continuing duty' that 'is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown.'" *Gutteridge v.*

*Oklahoma*, 878 F.3d 1233, 1238-39 (10th Cir. 2018) (alterations in original) (quoting

*Schwartz*, 702 F.3d at 580).

To state a claim under the special-relationship doctrine, a plaintiff must demonstrate that (1) the state official "kn[ew] of the asserted danger or failed to exercise professional judgment"; (2) the conduct had "a causal connection to the ultimate injury incurred"; and (3) the official's conduct "shock[s] the conscience." *Schwartz*, 702 F.3d at 583. To show a state official failed to exercise professional judgment, a plaintiff must show "more than mere negligence; the official must have abdicated her professional duty sufficient to shock the conscience." *Id.* at 585-86. Regardless of whether it is alleged that an official knew of a danger or failed to exercise professional judgment with respect to it, "a plaintiff must separately demonstrate the conscience-shocking nature of a defendant's conduct in order to mount a successful special-relationship claim." *Gutteridge*, 878 F.3d at 1241. We address that element further below.

####   ii.  State-created danger

"[T]his court has recognized that, as an exception to *DeShaney*'s general rule, a state official may be liable when 'a state actor affirmatively acts to create, or increase[] a plaintiff's vulnerability to, danger from private violence.'" *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (alterations in original) (quoting *Currier*, 242 F.3d at 923).

To invoke the danger-creation theory, a plaintiff must make—at a minimum—"a showing of affirmative conduct and private violence." *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013). Then the plaintiff can establish a claim by showing:

27

(1) [T]he charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Currier*, 242 F.3d at 918.

"[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir. 1998). In assessing a custody placement case based on danger-creation theory, we take into account a state employee's conduct only before legal custody was awarded. *See Currier*, 242 F.3d at 919.

d. *"Shocks the conscience"*

Under either the special-relationship or danger-creation exceptions to the *DeShaney* rule, the plaintiff must show that the defendant's conduct "shocks the conscience." "Conduct that shocks the judicial conscience . . . is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Seegmiller v. Laverkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employ[ed] it as an instrument of oppression. The behavior complained of must be egregious and outrageous." *Hernandez v. Ridley*, 734

28

F.3d 1254, 1261 (10th Cir. 2013) (alteration in original) (quotations omitted). A

defendant's "conduct as a whole"—including "both action and inaction"—are relevant in

evaluating whether it "shocks the conscience." *Estate of B.I.C.*, 710 F.3d at 1174. This

court considers the following principles when evaluating substantive due process claims

in this context: "(1) the general need for restraint; (2) the concern that § 1983 not replace

state tort law; and (3) the need for deference to local policy decisions impacting public

safety." *Currier*, 242 F.3d at 920.

The precise boundaries of conscience-shocking behavior are elusive. In a previous

case, "[w]e declined to precisely define this level of conduct, but left it to evolve over

time. . . . We do know, however, that [it] requires a high level of outrageousness,

because the Supreme Court has specifically admonished that a substantive due process

violation requires more than an ordinary tort." *Armijo*, 159 F.3d at 1262 (quotations

omitted).

"Conscience-shocking" is often defined by what it is not, or what it exceeds. *See,

e.g., Lewis*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically

beneath the threshold of constitutional due process."); *Gutteridge*, 878 F.3d at 1238-43

("[A] social worker who simply makes a mistake of judgment under what are admittedly

complex and difficult conditions will not find herself liable in damages under § 1983."

(quoting *Schwartz*, 702 F.3d at 583)); *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229,

1235 (10th Cir. 2000) ("Even knowingly permitting unreasonable risks to continue does

not necessarily rise to the level of conscience shocking."); *Tonkovich v. Kan. Bd. of

Regents*, 159 F.3d 504, 528 (10th Cir. 1998) ("[A] plaintiff must do more than show that

29

the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." (quotations omitted)).

3. **Analysis**

As noted earlier, the allegations against the DHS employees, considered collectively, are deeply troubling. And the allegations against some of the individual defendants are also concerning. The amended complaint, however, while it may have alleged sufficient facts for tort claims against some defendants, did not meet the highly demanding standard for substantive due process.

We therefore affirm the district court's dismissal of the § 1983 substantive due process claims under Rule 12(b)(6). We begin with the general rule that state actors are not liable for private violence and then consider whether an exception to that rule applies. Assessing claims against both the pre- and during-foster-care defendants, we conclude no claim has been stated under either the special-relationship or danger-creation exceptions.

a. *Pre-foster-care defendants*

Two time periods are relevant to the Hubbards' pre-foster-care claims. The first period is the time the children lived with their biological parents leading up to February 2013, when the Tulsa Police directed their removal from the home. The second period was May to August 2013, when the children were reunited with the biological parents.

i. Special relationship

The special relationship exception applies when a child is placed in foster care. *Schwartz*, 702 F.3d 573 at 580. It does not apply when the children are in the custody of their biological parents. *Yvonne L.*, 959 F.2d at 891 ("[T]here is no affirmative duty of

30

the state to protect a child who is in his *parents'* custody." (citing *DeShaney*, 489 U.S. at 201)). Accordingly, the Hubbards do not a state a claim for relief under this theory.

ii. State-created danger

Nor does the amended complaint allege a claim against the pre-foster-care defendants under a state-created danger theory.

First, the Hubbards have not pled sufficient facts to show that the state *created* the danger of private violence to the children. "[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Armijo*, 159 F.3d at 1263. Even if the pre-foster-care defendants put the children in danger by restoring them to their biological parents' home, they did not create the danger.

Second, the Hubbards have not pled sufficient facts to show that the pre-foster-care defendants *increased* the danger of private violence to the children. *T.D.*, 868 F.3d at 1221 (state actors may be liable when they "affirmatively act[] to create, or increase[] a plaintiff's vulnerability to, danger from private violence" (second alteration in original) (quotations omitted)). The amended complaint fails to allege that the living conditions worsened for the children following reunification with their biological parents.[9]

---

[9] State-created danger claims can apply to placement with a biological parent as well as a foster parent. *See Currier*, 242 F.3d at 919 ("When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, *DeShaney* does not foreclose constitutional liability.").

31

b. *During-foster-care defendants*

i.  Special relationship

Both parties acknowledge that foster care establishes a "special relationship" for § 1983 purposes. Nonetheless, as the district court concluded, the amended complaint's allegations against the during-foster-care defendants did not state a claim because they did not satisfy the demanding "shocks the conscience" standard. The amended complaint also was lacking as to certain defendants on the causation element. We address the allegations about Ms. Busby, Mr. Eason, Ms. McCartney, and Mr. Williams before turning to the remaining defendants.

1)  Ms. Busby

---

The Hubbards cite an unpublished district court case, *Tazioly v. City of Philadelphia*, No. CIV.A.97-CV-1219, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998), to argue that a state can increase danger of private violence to a child by placing the child with a biological parent. *See* Aplt. Br. at 38. This case is not binding and is readily distinguishable. In *Tazioly*, the child was born addicted to cocaine. *Tazioly*, 1998 WL 633747, at *3. At birth, the child was taken from his mother (who herself remained addicted to cocaine) and placed with another caretaker. *Id.* at *3-*4. The mother appeared "hostile, abusive, . . . paranoid" and "bizarre" to social workers. *Id.* at *3. During one visit with the child, she held him out of a second story window and threatened to drop him. *Id.* at *4. Internal DHS notes showed strong doubt about placing the boy with his mother, noting "no psychological evaluation," "no risk assessment," "no drug testing," and "why return home?" *Id.* at *5. But Defendants nonetheless placed the child with his mother. Once in her custody, he experienced severe abuse. He suffered skull and leg fractures, was beaten while in a full-body cast, and was burned with cigarettes tied naked in a chair. *Id.* at *5-*6.

The child in *Tazioly* experienced an immediate increase of vulnerability to private danger when placed with his biological mother (with whom he had never previously lived). DHS had significant pre-placement warning signs of the mother's behavior. The Hubbards' allegations regarding the children's reunification with their biological parents fall far short of the level in *Tazioly*.

The allegations about Ms. Busby covered mid-June 2013, when she "took over the case," to October 28, 2013. Aplt. App., Vol. II at 285 ¶ 17-290 ¶ 27. The amended complaint said nothing about Ms. Busby after that date, or how she had anything to do with A.P.' s injuries in February or August 2014. Although Ms. Busby may have been the lead caseworker from June to October 2013, the allegations identified seven other DHS employees and supervisors by name who also were involved during this time. The amended complaint also referred generally to "DHS workers," *e.g.*, *id.* at 287 ¶ 22, making it clear that multiple DHS employees, not just Ms. Busby, were working on the case.

The Hubbards repeatedly alleged that DHS employees "took no action to protect or safeguard the [c]hildren." *See, e.g.*, *id.* at 289 ¶ 26. But these conclusory allegations conflict with actions that were taken. According to the amended complaint, after the first report of sexual activity between the children in September 2013, DHS, with Ms. Busby as the lead case worker, arranged for therapeutic intervention. *Id.* at 287 ¶¶ 22-23. After the second report of sexual activity in October, Ms. McCartney responded to the referral and interviewed the children, *id.* at 288 ¶ 25, and Mr. Williams "placed services in the home to address E.J.H.'s behaviors" and initiated steps to "mov[e] E.J.H. out of the home to safeguard C.E.H. and [A.P.]," i*d.* at 289 ¶ 26.

The allegations about Ms. Busby must be considered in light of what her DHS co-workers were doing on the case. For example, even though the Hubbards alleged that Ms. Busby visited the foster home only once between August and October, *id.* at 290 ¶ 27, the amended complaint also alleged that Ms. McCartney visited the home in

33

October, showing that at least more than one person made home visits. *Id.* at 288 ¶ 25. After DHS arranged for therapy sessions to address the reports of sexual activity, the children attended some of the therapy sessions, but the Krajians did not take them to six sessions. Although the amended complaint alleged that Ms. Busby failed to take steps to ensure better attendance, and that her supervisor, Ms. Porter, called this lack of attention "heinous & shocking," *id*. at 288 ¶ 23, it did not allege facts showing conscious disregard of risk. It also did not allege that Ms. Busby was responsible for any delay in removing E.J.H. from the foster home. When the allegations about Ms. Busby are "viewed in total," *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008), they do not meet the demanding shocks the conscience standard for a substantive due process claim.[10]

These allegations are nonetheless troubling, showing that Ms. Busby was negligent in her handling of the children's case. But, as the district court concluded, based on the high bar that substantive due process case law sets for conscience-shocking conduct and Ms. Busby's awareness of what other DHS workers were doing on the case, her alleged acts and omissions do not state a claim under 42 U.S.C. § 1983. Under our precedent, "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona*, 222 F.3d at 1235.

---

[10] Because the "special relationship" exception applies only to post-foster-care conduct, we consider the allegations against Ms. Busby after the children's placement with the Krajians. The knowledge Ms. Busby acquired about the children *before* the foster placement may still be relevant to the analysis to the extent it informed her conduct regarding the children once they were living with the Krajians.

"State officials will only be held liable for violating a foster child's Fourteenth Amendment substantive due process rights if the official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown." *Schwartz*, 702 F.3d at 585 (alterations in original) (quotations omitted). Furthermore, "a plaintiff must separately demonstrate the conscience-shocking nature of a defendant's conduct in order to mount a successful special-relationship claim." *Gutteridge*, 878 F.3d at 1241.

Ms. Busby allegedly knew about the children's sexual conduct, but she also knew that DHS had recognized the need to take action and had arranged for therapy sessions. Her alleged failure to ensure that the children attended more therapy sessions was poor job performance, but the Hubbards have not sufficiently pled conduct that shocks the conscience.

Ms. Busby did not, according to the amended complaint, know about the Krajians' physically abusing the children during August to October 2013, other than reports of spanking. *See* Aplt. App., Vol. II at 288. The information available to her then would not have put her on notice of the risk of violence culminating in A.P.'s death many months later. The Hubbards have not sufficiently pled that (1) Ms. Busby knew of physical abuse or abdicated her professional duty with respect to the risk of physical

35

abuse; (2) her conduct caused the resulting harm (A.P.'s and C.E.H.'s injuries); or (3) her conduct shocked the conscience.[11]

### 2) Mr. Eason and Ms. McCartney

According to the amended complaint, Mr. Eason interviewed the children in September 2013 and Ms. McCartney interviewed them in October 2013 about their sexual activity. *Id.* at 287 ¶ 23-288 ¶ 25. Ms. McCartney also witnessed evidence of marijuana use in the foster home in October and learned that the Krajians were spanking E.J.H. and making him sleep on the floor. *Id.* at 288 ¶ 25. About two weeks later, she told at least four of her DHS colleagues that the foster parents were "not equipped to handle the level of care that the children need at this time." *Id.* at 290 ¶ 28. These allegations provide only minimal information about these defendants and fail to describe their roles in the case. The Hubbards do not plead that either Mr. Eason or Ms. McCartney specifically knew of risks of physical abuse from the Krajians other than reports of spanking.

As with Ms. Busby, the allegations about Mr. Eason and Ms. McCartney should not be viewed in a vacuum. The DHS team was gathering information, arranging for therapy sessions, providing home service, and planning for E.J.H.'s eventual removal

---

[11] Even if we consider Ms. Busby's pre-foster-placement conduct—infrequent home visits, inattention to the living conditions, and her flippant response to the biological parents' arrest—this conduct is likely negligent but does not shock the conscience.

from the foster home. As the district court concluded, even if the amended complaint alleged negligent conduct against these defendants, it did not adequately allege a substantive due process violation. With respect to sexual activity, the complaint did not sufficiently show causation or conscience-shocking conduct as to these defendants. As to physical abuse, the complaint did not sufficiently show knowledge, failure to exercise professional judgment, or conscience-shocking conduct.[12]

### 3) Mr. Williams

The amended complaint alleged that Mr. Williams was at least partially responsible for initiating E.J.H.'s removal from the foster home to receive therapy regarding his sexual activity with his sister. Although this took about four months to accomplish, when Ms. Caraway asked him about the situation in October 2013, he expressed "some concerns for the home" and said he "had placed services in the home to address" the boy's behaviors. *Id.* at 289 ¶ 26. Also, he said that once he learned of a babysitter's reporting of continued sexual activity between the children, he "began work towards moving the child from the home." *Id.*

The Hubbards' allegations do not state a substantive due process claim under 42 U.S.C. § 1983. Although Mr. Williams allegedly had knowledge of the sexual activity, the Hubbards have not sufficiently pled causation and conscience-shocking conduct. The amended complaint states that Mr. Williams "place[d] services in the

---

[12] Ms. McCartney is mentioned only one more time in the amended complaint. It alleged that she was notified on August 27, 2014, that A.P. had been hospitalized with bone fractures and that she had interviewed C.E.H. and Ms. Krajian's sister shortly after A.P.'s death. Aplt. App., Vol. II at 291 ¶ 33-292 ¶ 34.

home" and "work[ed] towards moving the child from the home" upon learning of the September and October referrals. *Id.* Although the removal of E.J.H. took four months, the Hubbards have not sufficiently pled an affirmative link between this delay and Mr. Williams's conduct, nor have they pled facts showing that any delay caused sexual abuse. Considering the allegations about Mr. Williams in the context of what various DHS employees were doing contemporaneously on this case, we find the amended complaint does not sufficiently allege "conscience-shocking" behavior. *See Gutteridge*, 878 F.3d at 1241. As to the Krajians physical abuse of the children, the amended complaint did not sufficiently plead that Mr. Williams had knowledge of or failed to exercise professional judgment regarding that risk. For example, the last reference to Mr. Williams in the amended complaint was November 4, 2013, Aplt. App., Vol. II at 290 ¶ 28, months before the injuries to A.P.

4) Other defendants

We agree with the district court that the allegations against other during-foster-care defendants are insufficient to state a claim. As to many of these defendants, the amended complaint alleged nothing more than their attendance at a meeting. Their alleged inaction tells us very little. Absent allegations that they were responsible for a broader policy that harmed the children, the amended complaint's vague claims against supervisors do not state a claim. *See Dodds*, 614 F.3d at 1199. And some defendants, such as Mr. Dugger and Mr. Johnson, seemingly had nothing to do with what happened based on the amended complaint's allegations. They were DHS employees who received

38

a referral once A.P. had already been fatally injured.  *See* Aplt. App., Vol. II at 292 ¶ 34. No further harm to the children is pled after that referral.

ii.  State-created danger

The during-foster-care § 1983 substantive due process claims based on a state-created danger theory fail to state a claim.  In assessing a custody placement case based on a danger-creation theory, we consider only a state employee's conduct before legal custody was awarded.  *Currier*, 242 F.3d at 919.  The Hubbards have not pled sufficient facts to show why any defendant would have been on notice that the children would be at risk of danger from living with the Krajians.  The amended complaint therefore lacks allegations that any defendant exhibited "affirmative conduct" that created danger for the children.  *Estate of B.I.C.*, 710 F.3d at 1173 (to invoke the danger-creation theory, a plaintiff must make—at a minimum—"a showing of affirmative conduct and private violence").

## B.  *State Claims (Negligence and Wrongful Death)*

The Hubbards, in addition to their federal claims under § 1983, alleged state law claims for negligence and wrongful death and for a violation of the Oklahoma Constitution.  Although their amended complaint does not state a jurisdictional basis for their state claims, they need to rely on the federal supplemental jurisdiction statute, 28 U.S.C. § 1367.  After the district court dismissed the Hubbards' federal claims, it considered their state claims, dismissing them largely for failure to comply with the notice and claim procedures in the OGTCA.  We question whether the court should have continued to exercise jurisdiction over those claims.

39

We have held that supplemental jurisdiction over state claims "is exercised on a discretionary basis" and that "[i]f federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir.1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *see* Wright & Miller, Federal Practice & Procedure § 3567.3 (3d ed. 2018) ("As a general matter, a court will decline supplemental jurisdiction if the underlying [federal] claims are dismissed before trial."). We generally decline to exercise supplemental jurisdiction when no federal claims remain because "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229-30 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir.1995)).

When, as here, a district court dismisses all federal claims, it would normally dismiss the state claims without prejudice so that the plaintiff could pursue them in state court. *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."). This is especially so when, as here, the claims present potentially unsettled questions of state law. *See, e.g.*, *Wentzka v. Gellman,* 991 F.2d 423, 425 (7th Cir. 1993) (retention of jurisdiction over case held improper where state law was unsettled); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 589 (5th Cir. 1992) ("[T]he interests of federalism and comity point strongly toward dismissal. All of the remaining legal issues

40

of the case . . . are of state law, and . . . they are difficult ones."). In *Patel v. Hall*, 849 F.3d 970, 987-88 (10th Cir. 2017), we said, "On remand, the district court should first reconsider whether it should decline to exercise pendent jurisdiction over the state law claims and instead dismiss them without prejudice in light of the limited nature of the sole remaining federal claim in this action and the arguable existence of some unsettled questions of state law."

The district court, after dismissing the Hubbards' federal claims, addressed their state claims, including whether the Hubbards' failure to comply with the procedural requirements of the OGTCA should preclude them from proceeding on all of their state law claims. That question is challenging due to undeveloped state court precedent, the Hubbards' allegations of willful and wanton conduct, their naming both the DHS and the individuals as defendants, and their attempt to assert a state constitutional claim. The district court did not explain why it chose to address the state claims. Nor did it analyze, in light of comity and federalism concerns, whether continued supplemental jurisdiction was appropriate after dismissal of the federal claims.[13]

---

[13] Discretionary factors to exercise supplemental jurisdiction are listed in 28 U.S.C. § 1367(c):

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if —
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

Without the benefit of explanation or analysis to assess the district court's discretionary exercise of supplemental jurisdiction under § 1367, and having affirmed the dismissal of the Hubbards' federal claims, we reverse the dismissal with prejudice of the state law claims and remand to the district court. *See Patel*, 849 F.3d at 987-88 (remanding for reconsideration of supplemental jurisdiction). The court should address whether to decline supplemental jurisdiction over the state law claims and dismiss them without prejudice. This would allow the state courts to address the viability of the Hubbards' state tort claims under the OGTCA should they choose to continue to pursue them there. *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir. 1997) ("The Supreme Court has instructed us that federal courts should consider the propriety of exercising supplemental jurisdiction 'in each case, and at every stage of the litigation.'" (quoting *Carnegie-Mellon Univ.,* 484 U.S. at 350)).[14]

## III. **CONCLUSION**

Our opinion should not be read to condone or approve of the Defendants' conduct as alleged in the amended complaint—just the opposite—especially DHS. Under the

---

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

[14] In *VR Acquisitions, LLC v. Wasatch County*, 853 F.3d 1142 (10th Cir. 2017), this court recently held "that the district court should have simply declined to exercise supplemental jurisdiction over [the plaintiff's] state-law claims after it dismissed [the plaintiff's] federal claims." *Id.* at 1149. We thus "reverse[d] the district court's order dismissing [plaintiff's] state-law claims with prejudice and remand[ed] with instructions to dismiss those claims without prejudice." *Id.* at 1150.

42

amended complaint, DHS failed to protect these children, and the results were tragic. But DHS is not a defendant under the § 1983 substantive due process claim, and the Hubbards' amended complaint does not meet the exacting standard for pleading conscience-shocking behavior, and in some instances causation, on the part of individual defendants standing on their own. Accordingly, we affirm the district court's dismissal of the Hubbards' federal claims. We remand for the district court to decide whether it should decline supplemental jurisdiction on the remaining state law claims.[15]

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[15] Because we agree with the district court and hold that the Hubbards have not sufficiently stated a claim showing an underlying § 1983 violation, any associated request for injunctive or declaratory relief based on the § 1983 allegations is accordingly denied.